NOTICE
Decision filed 01/31/18. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2018 IL App (5th) 170072

NO. 5-17-0072

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| AUSTIN L. CHERRY and LESLEY TAYLOR, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Massac County. |
| | ) | |
| v. | ) | No. 16-MR-10 |
| | ) | |
| ELEPHANT INSURANCE COMPANY, INC., | ) | |
| d/b/a Elephant Auto Insurance, | ) | Honorable |
| | ) | Joseph Jackson, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court, with opinion.
Justices Cates and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The plaintiffs, Austin Cherry (Cherry) and Lesley Taylor (Taylor), were injured when Cherry's vehicle was struck by an underinsured driver on June 6, 2015, in Massac County, Illinois. His vehicle was insured by the defendant, Elephant Insurance Company (Elephant). Both plaintiffs settled their bodily injury claims with the at-fault driver's automobile insurer for $25,000, though their damages far exceeded that amount. The plaintiffs filed a complaint for declaratory judgment against Elephant on February 9, 2016, asking the circuit court to find that Elephant's policy provides $300,000 in underinsured motorist coverage to both plaintiffs, as the policy allowed aggregation of the liability limits of the underinsured motorist coverage on four vehicles. The plaintiffs filed a motion for summary judgment on July 13, 2016, and Elephant

filed a motion for summary judgment on August 30, 2016. On February 27, 2017, the circuit court entered an order denying the plaintiffs' motion and granting Elephant's motion. For the following reasons, we reverse the judgment of the circuit court.

¶ 2    At the time of the accident, Cherry was driving a 2008 Ford Focus with Taylor as his passenger. Cherry was insured under a policy issued by Elephant. At the plaintiffs' request, Christy Parks, a product compliance specialist for Elephant, sent them a certified copy of the policy on November 6, 2015. This copy, which was attached to the plaintiffs' complaint for declaratory judgment, included the declarations page, cover page, and the policy details.

¶ 3    The policy was issued to Richard Cherry, Austin Cherry's father, for a period extending from January 12, 2015, to January 12, 2016. The drivers listed on the policy declaration page are Richard A. Cherry, Amy Cherry, Austin Cherry, and Israel Cherry. On the next two sheets of the declaration page, under "Coverage Outline," the policy shows four insured vehicles: the 2008 Ford Focus that Cherry was driving at the time of the accident, a 2010 Kia Soul, a 2010 Ford Flex, and a 2006 BMW 330. The policy charged four separate premiums, one for each vehicle. The coverage type and the corresponding limits of liability are listed separately for each vehicle. Each vehicle under the policy carried coverage for "uninsured/underinsured motorist—bodily injury" with a limit listed as "$25,000/$50,000." For clarity, the declaration pages in their original formatting are included at the end of this opinion.

¶ 4    Following the declaration pages, the policy has a cover page titled "Illinois Personal Auto Policy." In the bottom left corner, in smaller type, the page reads:

"READ YOUR POLICY, DECLARATIONS, AND ENDORSEMENTS CAREFULLY

The automobile insurance contract between the named insured and Elephant consists of this policy, plus the declarations page and any applicable endorsements.

The policy provides the coverages, and amounts of insurance are shown on the declarations when premium is charged."

After a table of contents, the first paragraph in the policy, titled "AUTO POLICY," states:

"This policy is a contract between the named insured shown on the declarations page and us. This contract, the declarations page, your Application and any endorsements that apply to this contract contain all of the agreements between you and us. If you pay the required premium when due, we will provide the insurance described in this contract."

After listing general definitions, the policy is divided into parts. Part A describes liability coverage, part B describes medical payments coverage, part C describes uninsured/underinsured motorist coverage, part D describes damage to an auto (collision coverage), and part E describes roadside assistance coverage.

¶ 5 In part C's description of uninsured/underinsured motorist coverage, under "LIMITS OF LIABILITY," the policy states:

"There will be no stacking or combining of coverage afforded to more than one auto under this policy. The limit of liability shown on the declarations page for the coverages under Part C is the most we will pay regardless of the number of:

1. Claims made;
2. Covered autos;
3. Autos and trailers shown on the declarations page;
4. Insureds;
5. Lawsuits filed;
6. Motor vehicles and trailers involved in an accident;
7. Heirs or survivors of person with bodily injury; or
8. Premiums paid."

3

¶ 6    The next paragraph states that "[i]f more than one policy of uninsured or underinsured motorist coverage applies to an accident, the maximum the Insured may recover from all of the applicable coverage is the highest limit available under one policy for one auto."

¶ 7    As previously mentioned, a dispute arose between the parties regarding the amount of underinsured motorist coverage available to Cherry and Taylor under this policy. In its motion for summary judgment, Elephant argued that the underinsured motorist coverage limits are $25,000 per person and $50,000 per occurrence, citing the declarations page, the cover page, and Richard Cherry's application, which lists uninsured/underinsured motorist coverage with limits of liability of $25,000 per person and $50,000 per accident. Elephant also argued that the policy clearly and unambiguously prohibits the stacking of underinsured motorist coverage by stating that "[t]here will be no stacking or combining of coverage afforded to more than one auto under this policy." Elephant concluded that because each plaintiff settled with the underlying tortfeasor for $25,000, no underinsured motorist coverage claim exists because the tortfeasor's limits are not less than the insured's limits, and therefore, the tortfeasor's vehicle is not considered underinsured by statute. Attached to Elephant's motion was a copy of Richard Cherry's insurance application, along with copies of the declarations page and the policy.

¶ 8    The plaintiffs responded that the certified copy of the policy sent to them did not include the application and, as such, any reference to the application should be disallowed or considered an impermissible introduction of parol evidence. The plaintiffs argued that, because the limits of liability for underinsured motorist coverage on the declarations sheet were listed multiple times, the policy was ambiguous as to whether the plaintiffs may combine the limits of all the vehicles insured under the policy. The plaintiffs maintained that the policy's language does not clearly

4

prohibit stacking and the language pointed to by Elephant does not clearly and definitively clarify the ambiguity. The trial court found in favor of Elephant, and the plaintiffs appeal.

¶ 9    The issue in this case is whether the underinsured motorist coverage on the four vehicles insured by Elephant may be stacked, despite the antistacking language in the relevant section of the policy. Elephant maintains that the limit of liability for underinsured motorist coverage is $25,000 per person and $50,000 per accident and that the coverages may not be stacked because the antistacking provisions are clear and unambiguous. The plaintiffs respond that listing multiple limits on the declarations page creates an ambiguity that is not cured by Elephant's antistacking clause, which prohibits the combining of *coverages*, as opposed to prohibiting the combining of the *limits of liability*. We agree with the plaintiffs.

¶ 10    In an appeal from the grant of a summary judgment, we conduct a *de novo* review. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390 (1993). The construction of an insurance policy is a question of law and is an appropriate subject for disposition by way of a summary judgment. *Johnson v. Davis*, 377 Ill. App. 3d 602, 606 (2007).

¶ 11    An insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies. *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005). In general, antistacking clauses do not contravene public policy. *Grzeszczak v. Illinois Farmers Insurance Co.*, 168 Ill. 2d 216, 229 (1995). The Illinois Insurance Code (Code) authorizes antistacking provisions of underinsured motorist coverage in automobile insurance policies. The underinsured motorist statute provides:

"Nothing herein shall prohibit an insurer from setting forth policy terms and conditions which provide that if the insured has coverage available under this Section under more than one policy or provision of coverage, any recovery or benefits may be equal to, but

5

may not exceed, the higher of the applicable limits of the respective coverage, and the limits of liability under this Section shall not be increased because of multiple motor vehicles covered under the same policy of insurance." 215 ILCS 5/143a-2(5) (West 2014).

¶ 12    Where the terms of a policy are clear and unambiguous, the language used will be given its plain meaning; however, if a provision is subject to more than one reasonable interpretation, it is ambiguous and should be construed against the insurer and in favor of the insured. *Murphy v. State Farm Mutual Automobile Insurance Co.*, 234 Ill. App. 3d 222, 225 (1992). The reasons behind interpreting an insurance policy in this way are twofold: (1) an insured's intent in obtaining insurance is to have coverage, and thus, any ambiguity jeopardizing coverage should be construed consistent with the insured's intent, and (2) it is the insurer who is the drafter of the policy, and the insurer could have drafted the ambiguous provision clearly and specifically. *Id.* at 226. Therefore, attempts to limit or exclude coverage must be done clearly, unambiguously, and free of any doubt as to the intended meaning. *Lenkutis v. New York Life Insurance Co.*, 374 Ill. 136, 140 (1940).

¶ 13    In determining whether an ambiguity exists, all of the provisions in an insurance contract should be read together. *Glidden v. Farmers Automobile Insurance Ass'n*, 57 Ill. 2d 330, 336 (1974). Reasonableness is the key, and the touchstone is whether the provision is subject to more than one reasonable interpretation, not whether creative possibilities can be suggested. *Bruder v. Country Mutual Insurance Co.*, 156 Ill. 2d 179, 193 (1993); *Johnson*, 377 Ill. App. 3d at 607.

¶ 14    After reviewing the policy as a whole, we find that the policy is ambiguous as to whether the limits of liability may be stacked. We reach this conclusion from an analysis of *Bruder* and its progeny.

6

¶ 15    In *Bruder*, the Illinois Supreme Court considered whether a plaintiff should be allowed to stack uninsured motorist coverage on two vehicles set forth on a single automobile policy. 156 Ill. 2d at 191. The policy's limit of liability for uninsured benefits provided that " '[t]he most we will pay for all damages resulting from bodily injury to any one person caused by any one accident is the limit of Bodily Injury shown in the declarations for "Each Person." ' " *Id.* at 189. The court held that there was no ambiguity when the antistacking clause was read in conjunction with the declarations page because the limit of the bodily injury for "each person" (in the amount of $100,000) was set forth only once on the declarations page, despite listing two vehicles. *Id.* at 193-94. The court noted, however, that multiple printings of policy limits on a declarations page could create an ambiguity, stating:

>   "It would not be difficult to find an ambiguity created by such a listing of the bodily injury liability limit for each person insured. *** There would be little to suggest in such a listing that the parties intended that coverage was to be limited to that provided for only one of the two [vehicles]. It would be more reasonable to assume that the parties intended that, in return for the two premiums, two *** coverage amounts were afforded." *Id.* at 192.

In other words, the court opined that such a policy could easily be interpreted as providing a total limit of $200,000 because a figure of $100,000 would be shown for each vehicle. *Id.* However, in the case before it, because the policy listed only one limit of liability on the declarations page, it could only reasonably be read as providing that amount and was therefore unambiguous.

¶ 16    Courts interpreting Illinois law, including this court, have followed the *Bruder* rationale and found that, despite indication elsewhere in the contract that stacking of policy limits is not permitted, a declarations page that prints the policy limit more than once could reasonably be

7

interpreted as providing a policy limit that is the sum of the printed limits. See *Allen v. Transamerica Insurance Co.*, 128 F.3d 462, 466-67 (7th Cir. 1997) (the policy's limit of liability section directed the insured to find the limit of underinsured coverage in the declarations, where multiple numerical limits appeared; the limit of liability clause could thus be read multiple ways, rendering the meaning ambiguous and aggregation to result); *Pekin Insurance Co. v. Estate of Goben*, 303 Ill. App. 3d 639, 648-49 (5th Dist. 1999) (same); *Yates v. Farmers Automobile Insurance Ass'n*, 311 Ill. App. 3d 797, 800 (5th Dist. 2000) (same).

¶ 17    The Illinois Supreme Court returned to this issue in *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11 (2005). The court noted the similarities between the insurance policy at issue and the *Bruder* policy, noting that, in both cases, the antistacking clauses tied the limit of liability to the limit shown in the declarations page and both policies' declarations pages listed the premiums for two vehicles separately "but, importantly, list[ed] the relevant limit of liability only once." *Id.* at 21. The court read the antistacking provision in conjunction with the declarations page and determined that the policy in question was unambiguous and that the coverages did not stack. *Id.* The *Hobb*s court noted that listing multiple numerical limits on the policy's declaration page does not *per se* result in aggregation, and variances in policy language "frequently require case-by-case review." *Id.* at 26 n.1. However, the court reiterated its statement in *Bruder* that "where the antistacking clause limits liability to the limit shown on the declarations page, and the declarations page lists the limit of liability twice, it would not be difficult to find an ambiguity." *Id.* at 25 (citing *Bruder*, 156 Ill. 2d at 192).

¶ 18    Finally, relying on *Bruder*, *Allen*, *Estate of Goben*, and *Yates*, this court determined in *Johnson v. Davis* that stacking was allowed under the policy in question because the limits of the coverage were listed multiple times, once for each vehicle covered, and four separate premiums

8

for the coverage were also listed on the declarations sheet. 377 Ill. App. 3d 602, 609 (2007). In *Johnson*, the four vehicles under the policy carried underinsured motorist coverage of $50,000 per person and $100,000 per accident. *Id.* at 603. The policy contained a general antistacking provision. *Id.* at 605-06. The underinsured motorist endorsement directed the insured to " 'SEE DECLARATION FOR LIMIT OF LIABILITY AND PREMIUM,' " and the endorsement also contained a limit of liability clause stating that the limit of liability shown in the declarations page was the maximum limit of liability. *Id.*

¶ 19    The declarations page showed limits of $50,000 per person, and those limits were listed four separate times. *Id.* at 610. Applying the case-by-case review directed by *Hobbs*, this court found that a reasonable person could believe that the policy provided $50,000 of underinsured motorist coverage for each of the four vehicles carrying underinsured motorist coverage, for a total of $200,000 in underinsured motorist coverage. *Id.* at 609. This court found that the antistacking clauses in the policy created an ambiguity when read with the declarations page and affirmed the trial court's decision granting plaintiff Johnson $200,000 in underinsured motorist coverage. *Id.* at 610.

¶ 20    Here, like the cases described above, the policy's limit of liability section directs the insured to find the limit of underinsured coverage in the declarations under the limit of liability section for underinsured motorist coverage; specifically, this policy states that "[t]he limit of liability shown on the declarations page for the coverages under Part C is the most we will pay." Then, like the above-discussed cases, the declarations page lists four vehicles with four separate limits of liability. The abundant case law precedent indicates that this creates an ambiguity favoring aggregation of the four vehicles' limits of liability for underinsured motorist coverage.

9

¶ 21    We remain mindful that "there is no *per se* rule that listing the numerical limits more than once on the declarations page creates an ambiguity which results in allowing the policies to be stacked." *Id*. at 609. Further, although we recognize that the policy has specific antistacking language stating that "[t]here will be no stacking or combining of coverage afforded to more than one auto under this policy," this clause does nothing to cure the ambiguity created by its limit of liability clause combined with the multiple listed limits on the declarations page.

¶ 22    On the declarations page, under each of the four vehicles, there are four columns with five rows of coverage descriptors. Below, we have reproduced the coverage outline details for the 2008 Ford Focus.[1]

| Coverage Type | Limits | Deductible | Premium |
|---|---|---|---|
| Bodily Injury Liability | $25,000/$50,000 | | $155.15 |
| Property Damage Liability | $25,000 | | $137.08 |
| Uninsured/Underinsured Motorist—Bodily Injury | $25,000/$50,000 | | $16.19 |
| Other Than Collision | | $100 | $196.61 |
| Collision | | $500 | $482.48 |

As mentioned above, the policy's antistacking language stated that there will be no stacking or combining of "coverage." Based on the above coverage outline details, a logical conclusion is that these five coverages cannot be stacked with any of the other coverages; *e.g*., an insured may not combine his "property damage liability" with his "other than collision" liability. Meanwhile, there is no blanket prohibition on combining the limits of the available coverage. In other words, the ambiguity created by printing multiple limits on the declarations page is not cured by language prohibiting the combining of *coverages* and not the *limits of liability*. "Coverage" and "limit of liability" of that particular coverage are not synonymous terms. The language is plainly

---

[1] The formatting in our example is not exact. Please refer to the copy of the policy's declarations page included in this opinion's appendix for an exact replica.

10

susceptible to more than one reasonable interpretation—the insured may be prohibited from combining his different coverages, or he may be prohibited from aggregating the limits of his coverages, despite paying premiums for them all.

¶ 23    In support of its position, Elephant cites *State Farm Mutual Automobile Insurance Co. v. McFadden*, in which the Second District prohibited aggregation. 2012 IL App (2d) 120272, ¶ 39. In *McFadden*, an insured wished to aggregate underinsured limits of liability on five separate policies insuring five separate vehicles. *Id.* ¶ 5. State Farm argued that its antistacking provisions limited underinsured coverage to the highest single policy, citing language in the policy that " '[i]f underinsured motor vehicle coverage for bodily injury is available to an insured from more than one policy provided by us or any other insurer, the total limit of liability available from all policies provided by all insurers shall not exceed the limit of liability of the single policy provided the highest limit of liability.' " (Emphasis omitted.) *Id.* ¶ 15. The court found that while reading the declarations sheets in isolation might leave open the question of stacking, the antistacking provision unambiguously answered the question in the negative. *Id.* ¶ 36.

¶ 24    We do not find Elephant's supporting case law persuasive. The antistacking language in *McFadden* involves an issue not before this court; that is, whether limits of liability on multiple separate policies may be aggregated. Elephant has a similar provision in its policy dealing with multiple insurance policies applicable to an accident, which states that "[i]f more than one policy of uninsured or underinsured motorist coverage applies to an accident, the maximum the Insured may recover from all of the applicable coverage is the highest limit available under one policy for one auto." As there is not "more than one policy" of underinsured motorist coverage in the instant case, we find that *McFadden* is inapposite to our conclusion.

11

¶ 25   Elephant also argues that the application for the Elephant policy, read in conjunction with the declarations and the policy, makes clear that the coverage available for underinsured motorist coverage is $25,000 per person and $50,000 per accident. Elephant points to the first page of the insurance policy, which states that, "[t]his contract, the declarations page, your Application and any endorsements that apply to this contract contain all of the agreements between you and us."

¶ 26   An insurance policy must be interpreted from examination of the complete document. *Hobbs*, 214 Ill. 2d at 23. However, as the plaintiffs properly point out, the application was not included in the certified copy of the policy sent to the plaintiffs, and the title page of the certified policy states that "[t]he automobile insurance contract between the named insured and Elephant consists of this policy, plus the declarations page and any applicable endorsements." This policy statement directly conflicts with the subsequent policy statement that the application is included in "all of the agreements between [Richard Cherry] and [Elephant]." Again, an ambiguity is created when the insured reads these statements together. Moreover, Elephant's reference to the application ignores the language on the title page following the initial statement, which states that "amounts of insurance are shown on the declarations," which corresponds with Elephant's directions in the limit of liability clause for the insured to find the limits in the declarations page.

¶ 27   The Code authorizes Elephant to limit its liability in providing underinsured motorist coverage to a single amount, despite collecting premiums for multiple amounts. See 215 ILCS 5/143a-2(5) (West 2014). However, Elephant is required to clearly and unambiguously inform its policyholders that their coverage has limitations or exclusions. Elephant failed to do so, and the ambiguity created by this failure must be construed against the insurer and in favor of the insured. See *Murphy*, 234 Ill. App. 3d at 225. As such, the limits of liability of the four vehicles aggregate to provide $100,000/$200,000 of underinsured motorist coverage.

12

¶ 28    We turn now to the question of the amount of coverage to which the plaintiffs are actually entitled. In the policy's description of uninsured/underinsured motorist coverage, under "LIMITS OF LIABILITY," the policy states:

> "If the declarations page shows one limit under this coverage for each person and another limit for each accident, the following limits shall apply to each accident:
>
> 1. The amount shown for 'each person' is the most we will pay for all damages due to a bodily injury to one person;
>
> 2. Subject to the 'each person' limit, the amount shown for 'each accident' is the most we will pay for all damages due to bodily injury sustained by two or more persons in any one accident."

¶ 29    Thus, the policy states, if the declarations page shows one limit for "each person" and one limit for "each accident," different payment terms apply. However, the plaintiffs point out that when the limit of liability and the declarations are read together, "$25,000/$50,000" are the amounts encountered under the "Limits" column of uninsured/underinsured motorist coverage— there is no reference to "each person" or "each accident" anywhere on the declarations page. Thus, the plaintiffs argue, while one reasonable interpretation of the limit of liability is $25,000 per person and $50,000 per accident, another reasonable interpretation, based on the formatting of the page, is that the limits are $25,000 for uninsured bodily injury and $50,000 for underinsured bodily injury.

¶ 30    Again, the relevant row appears on the declarations page as the following:

"Uninsured/Underinsured Motorist—Bodily Injury          $25,000/$50,000"

Uninsured and underinsured coverage are stated on the same row, separated by a slash. The amounts of $25,000 and $50,000, directly across from these coverages and having no indication

13

of a "per person" or "per accident" designation, also are separated by a slash. We agree with the plaintiffs that both interpretations are reasonable. Again, where there is more than one reasonable interpretation of a provision, it is ambiguous and will be construed against the insurer and in favor of the insured. *Murphy*, 234 Ill. App. 3d at 225.

¶ 31 Therefore, as the policy does not unambiguously prohibit aggregation, nor does it unambiguously state the amounts of the underinsured limits when the policy's limits of liability clauses and the declarations page are read together, we find that the plaintiffs could reasonably conclude that Richard Cherry had purchased $50,000 of underinsured benefits four times, resulting in $200,000 of underinsured motorist coverage for each plaintiff. We therefore find that the plaintiffs are each entitled to that amount of coverage.

¶ 32 For the foregoing reasons, we reverse the decision of the Massac County circuit court and aggregate the underinsured motorist benefits available to the plaintiffs in this case.


¶ 33 Reversed.

14

PO Box 5005
Glen Allen, VA 23058-5005
www.elephant.com


**Elephant**
Auto Insurance

*Underwritten by Elephant Insurance Company*

Richard A Cherry
5996 South US 45
Metropolis, IL 62960

www.elephant.com

**1-877-21-TRUNK**
For customer service and claims service.

**Policy Number:** 214-000-056-03

**Policy Effective Date:** 01/12/2015 at 12:01 AM
**Policy Expiration Date:** 01/12/2016 at 12:01 AM
  Endorsement Date:    01/15/2015 at 12:01 AM
  Endorsement Type:
    Other

# Auto Insurance
# Coverage Summary
## Policy Declaration Page

Your policy begins on 01/12/2015 and will end on 01/12/2016. Your policy and any endorsements contain a full explanation of your coverage.

## Drivers

| Driver | Age | Gender | Marital Status |
|---|---|---|---|
| Richard A Cherry | 60 | Male | Married/Civil Union |
| Amy Cherry | 40 | Female | Married/Civil Union |
| Austin Cherry | 18 | Male | Never Married |
| Israel Cherry | 18 | Male | Never Married |

\* Additional drivers displayed on addendum

## Premium Discounts

E-Signature Discount, Paperless Discount, Responsible Driver Discount, Online Discount, Homeowners Discount, Multi-Car Discount, Good Student Discount, Anti-Theft Discount

### IMPORTANT INFORMATION REGARDING YOUR INSURANCE

In the event you need to contact someone about this insurance for any reason, you may contact the insurance company issuing this insurance at the following address and telephone number—PO Box 5005, Glen Allen, VA 23058-5005, 1-877-218-7865.

If you pay a premium for Uninsured Motorist Property Damage Coverage, the limit of liability for that coverage is the lesser of the actual cash value of the coverage vehicle or the limit displayed on your declarations page, subject to a $250 deductible. UMPD is available only for vehicles for which you have not purchased collision coverage.

\*A Marital Status of 'married' (see above) includes Civil Unions recognized by Illinois law. 750 IL 75/1.

EIC_ZZ_DecPage_1014

# Coverage Outline

2008 FORD FOCUS
VIN: 1FAHP35NX8W190263          ZIP: 62960
Signet Federal Credit Union     Loss Payee      P O Box 426, Paducah, KY 42002

| Coverage Type | Limits | Deductible | Premium |
|---|---|---|---|
| Bodily Injury Liability | $25,000/$50,000 | | $155.15 |
| Property Damage Liability | $25,000 | | $137.08 |
| Uninsured/Underinsured Motorist - Bodily Injury | $25,000/$50,000 | | $16.19 |
| Other Than Collision | | $100 | $196.61 |
| Collision | | $500 | $482.48 |

| | |
|---|---|
| Total Premium | $987.51 |
| Additional Fees | $0.00 |
| Total | $987.51 |

2010 KIA SOUL
VIN: KNDJT2A18A7122645          ZIP: 62960
Signet Federal Credit Union     Loss Payee      PO Box 426, Paducah, KY 42002

| Coverage Type | Limits | Deductible | Premium |
|---|---|---|---|
| Bodily Injury Liability | $25,000/$50,000 | | $145.15 |
| Property Damage Liability | $25,000 | | $162.31 |
| Uninsured/Underinsured Motorist - Bodily Injury | $25,000/$50,000 | | $22.99 |
| Other Than Collision | | $500 | $179.40 |
| Collision | | $500 | $515.15 |

| | |
|---|---|
| Total Premium | $1,025.00 |
| Additional Fees | $0.00 |
| Total | $1,025.00 |

EIC_22_DecPage_0412

A7

# Coverage Outline

2010 FORD FLEX
VIN: 2FMGK5CC1ABB29789          ZIP: 62960

| Coverage Type | Limits | Deductible | Premium |
|---|---|---|---|
| Bodily Injury Liability | $25,000/$50,000 | | $123.80 |
| Property Damage Liability | $25,000 | | $138.44 |
| Uninsured/Underinsured Motorist - Bodily Injury | $25,000/$50,000 | | $16.62 |
| Other Than Collision | | $500 | $210.58 |
| Collision | | $500 | $549.99 |
| Rental Reimbursement | $30 per day / $900 max | | $46.28 |
| Custom Equipment Coverage | Up to $1,000 | | $0.00 |

| | | |
|---|---|---|
| Total Premium | | $1,085.71 |
| Additional Fees | | $0.00 |
| Total | | $1,085.71 |

2006 BMW 330
VIN: WBABW53416PZ42123          ZIP: 62960
Signet Federal Credit Union          Loss Payee          2450 New Holt Road, Paducah, KY 42003

| Coverage Type | Limits | Deductible | Premium |
|---|---|---|---|
| Bodily Injury Liability | $25,000/$50,000 | | $117.14 |
| Property Damage Liability | $25,000 | | $130.99 |
| Uninsured/Underinsured Motorist - Bodily Injury | $25,000/$50,000 | | $15.42 |
| Other Than Collision | | $250 | $425.01 |
| Collision | | $250 | $621.82 |

| | | |
|---|---|---|
| Total Premium | | $1,310.38 |
| Additional Fees | | $0.00 |
| Total | | $1,310.38 |

EIC_ZZ_DecPage_0412

A8

2018 IL App (5th) 170072

NO. 5-17-0072

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| AUSTIN L. CHERRY and LESLEY TAYLOR, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Massac County. |
| | ) | |
| v. | ) | No. 16-MR-10 |
| | ) | |
| ELEPHANT INSURANCE COMPANY, INC., | ) | |
| d/b/a Elephant Auto Insurance, | ) | Honorable |
| | ) | Joseph Jackson, |
| Defendant-Appellee. | ) | Judge, presiding. |

**Opinion Filed:**      January 31, 2018

**Justices:**      Honorable Thomas M. Welch, J.

                   Honorable Judy L. Cates, J., and
                   Honorable James R. Moore, J.,
                   Concur

**Attorneys for Appellants**      James R. Lambert, Stephen W. Stone, Howerton, Dorris, Stone & Lambert, 300 West Main Street, Marion, IL 62959

**Attorney for Appellee**      Joseph T. Madrid, Shelton & Madrid, LLC, 11820 Tesson Ferry Road, Suite 208, Plaza 21, St. Louis, MO 63128