2026 IL App (1st) 242355-U

SECOND DIVISION
March 24, 2026

No. 1-24-2355

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| STONEGATE INSURANCE COMPANY, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 22CH8889 |
| | ) | |
| GONZO'S ENTERPRISES, INC., and | ) | Honorable |
| WILLIAM ROBERT BARTLETT, | ) | Thaddeus L. Wilson, |
| | ) | Judge Presiding |
| Defendants-Appellants. | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice D.B. Walker concurred in the judgment.

### O R D E R

¶ 1 *Held*: In declaratory judgment action involving underinsured motorist coverage in multivehicle policy, the circuit court properly resolved cross-motions for summary judgment in the insurer's favor where policy unambiguously precluded stacking each vehicle's coverage.

¶ 2 This is an insurance coverage dispute over the availability of underinsured motorist (UIM) benefits. William Robert Bartlett was driving from Omaha, Nebraska to Chicago on October 17, 2020, in a car owned by Gonzo's Enterprises, Inc. (Gonzo's) when another driver caused a collision in which Bartlett was severely injured. Bartlett's medical bills totaled almost $1 million, but the other driver was insured for only $50,000. Bartlett accepted the limits of the other driver's liability coverage and sought UIM coverage from Gonzo's insurer, Stonegate Insurance Company

(Stonegate). The private passenger auto insurance policy that Stonegate had issued to Gonzo's included declarations that listed 17 vehicles, including the 2012 Toyota Camry that Bartlett had been driving, and 16 drivers, including Bartlett. Stonegate, however, denied Bartlett's claim, contending that its policy provided him a maximum of $50,000 UIM coverage, and since he had received $50,000 from the insurer of the at-fault driver, that driver was not underinsured for purposes of the Stonegate policy. Stonegate disagreed with Bartlett's contention that he was owed substantially more because ambiguities in the policy entitled him to "stack" (aggregate or combine) the UIM bodily injury limits for all 17 covered vehicles in order to address his injuries. Stonegate then filed this declaratory judgment action in which it prevailed on cross-motions for summary judgment. Bartlett and Gonzo's appeal. Because they have filed a single brief, we will be referring to them as the singular person Bartlett.

¶ 3     The issue on appeal is whether the Stonegate policy, properly construed, permits "stacking" of UIM coverage. Stacking is a concept that sometimes appears in disputes over UIM and uninsured motorist coverage. In *Kuhn*, the Fourth District provided the following well-written explanation of this "uncommon" issue:

> "¶ 9 'Stacking ordinarily involves combining or aggregating the policy limits applicable to more than one vehicle where the other vehicles are not involved in the accident.' [Citation.] 'The issue of whether coverage may be stacked arises only because the existence of coverage is a given.' *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 23 (2005). That is, stacking, by its nature, requires that one occurrence is covered by either (1) multiple policies or (2) multiple vehicles under the same policy, so that those multiple sources of coverage may be combined. See *Bruder v. Country Mutual Insurance*

*Co.*, 156 Ill. 2d 179, 186-87 (1993) (explaining that whether the antistacking clause appeared in only one of two policies did not matter because coverage can only be stacked when an occurrence is covered more than once).

***

¶ 11 Stacking frequently arises in the context of underinsured motorist (UIM) or uninsured motorist (UM) coverage [citation] because (1) UIM and UM coverage is provided to an insured person '*regardless of the vehicle* in which the insured person is located when injured' *** [citation], (2) the purpose of UIM and UM is ' "to place the insured in the same position he would have occupied if the tortfeasor had carried adequate insurance" ' [citation], and (3) UIM and UM coverage is required by statute to be included in all automobile insurance policies [citations]. These three factors mean that someone who obtains insurance for multiple vehicles is required to have UIM and UM coverage for *each vehicle*, which necessarily means that if such a person is in an accident caused by an uninsured or underinsured vehicle, then that person is potentially covered by the UIM and UM at least twice, once for each vehicle." (Emphasis in original.) *Kuhn v. Owners Insurance Co.*, 2023 IL App (4th) 220827, ¶¶ 9-11.

¶ 4    Antistacking provisions are provisions that allow insurers to limit liability coverage. See *Hobbs*, 214 Ill. 2d 11. They generally do not conflict with Illinois public policy and they are enforceable to the same extent as any other unambiguous contract terms. *Id.* at 17-18. In fact, for many years now, the Illinois Insurance Code has expressly authorized the use of antistacking provisions in motor vehicle insurance policies. 215 ILCS 5/143a-2(5) (West 2020) ("Nothing herein shall prohibit an insurer from setting forth policy terms and conditions which provide that

if the insured has coverage available under this Section under more than one policy or provision of coverage, any recovery or benefits may be equal to, but may not exceed, the higher of the applicable limits of the respective coverage, and the limits of liability under this Section shall not be increased because of multiple motor vehicles covered under the same policy of insurance.").

¶ 5    Barlett's arguments implicate the following familiar concepts. Insurance policies are contracts and when construing insurance policies we apply the general rules that govern the construction of contracts. *Hobbs*, 214 Ill. 2d at 17. The primary rule is to ascertain and give effect to the parties' intention at the time of contracting. *Id*. If the policy language is unambiguous, it will be applied as written, unless it conflicts with public policy. *Id*. However, if the policy language is susceptible to more than one reasonable interpretation, then it is ambiguous and must be construed in favor of the insured and strictly against the drafter of the policy. *Acuity v. M/I Homes of Chicago, LLC*, 2023 IL 129087, ¶ 31. See *Menke v. Country Mutual Insurance Co.*, 78 Ill. 2d 420, 424 (1980) (the rule of liberal construction comes into play only when there is an ambiguity). Only reasonable construction of the language should be considered, not mere "creative possibilities." *Bruder*, 156 Ill. 2d at 193 ("Reasonableness is the key."). "All the provisions of the insurance contract, rather than an isolated part, should be read together to interpret it and to determine whether an ambiguity exists." *U. S. Fire Insurance Co. v. Schnackenberg*, 88 Ill. 2d 1, 5 (1981). We will give effect to each provision where possible, under the assumption that each provision was intended to serve a purpose. *Acuity*, 2023 IL 129087, ¶ 31. Under Illinois law, the construction of an insurance policy is a question of law that we address *de novo*. *Acuity*, 2023 IL 129087, ¶ 21.

¶ 6    The *de novo* standard is also applicable because the circuit court granted summary judgment. *Id*. ¶ 20. Summary judgment is proper when "the pleadings, depositions, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). When parties file cross-motions for summary judgment, they are in implicit agreement that there are no genuine issues of material fact and that the dispute involves only questions of law, such that the court may decide the legal issues based on the record. *Acuity*, 2023 IL 129087, ¶ 21. However, the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment. *State Farm Mutual Automobile Insurance Co. v. Bierman*, 2019 IL App (5th) 180426, ¶ 14.

¶ 7    The Stonegate policy includes the following undisputed coverage terms:

"INSURING AGREEMENT

A. We will pay compensatory damages which an 'insured' is legally entitled to recover from the owner or operator of an "underinsured [m]otor vehicle" because of 'bodily injury'

1. sustained by an ['insured'] and

2. caused by an accident."

¶ 8    The policy also states: " 'Underinsured motor vehicle' means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident but its limit for bodily injury liability is less than the limit of liability for this coverage."

¶ 9    The parties' dispute centers on the format of the policy's declarations and the contents of an endorsement about UIM bodily injury.

¶ 10    The 17 vehicles and 16 drivers that Gonzo's insured through Stonegate are listed in the policy's declarations, which are entitled "Private Passenger Automobile Endorsement Declaration,

1-24-2355

DECLARATIONS EFFECTIVE 10/16/2020." Neither the vehicle list nor the driver list would have fit onto a single page and each list is broken into three parts and then printed over the course of the first three pages of the declarations. The vehicles are sequentially numbered, but the list begins with "Vehicle 2" and ends with "Vehicle 23" because the policy was amended from time to time when Gonzo's changed vehicles. On each page, above each section of the vehicle list is language that Stonegate contends sets a per-vehicle liability limit and is the first of two antistacking clauses. It states:

"INSURANCE IS PROVIDED WHERE A PREMIUM IS SHOWN FOR THE COVERAGE. FOR UNINSURED MOTORIST, UNDERINSURED MOTORISTS AND UNINSURED MOTORIST PROPERTY DAMAGE, THE LIABILITY LIMIT SHOWN ON THE DECLARATIONS FOR ANY ONE VEHICLE FOR THAT COVERAGE, IS THE MOST WE WILL PAY FOR DAMAGES RESULTING FROM ANY ONE ACCIDENT REGARDLESS OF THE NUMBER OF VEHICLES OR PREMIUMS SHOWN IN THE DECLARATIONS."

¶ 11    The following policy excerpt shows the above antistacking clause in context:

**VEHICLES COVERED**

INSURANCE IS PROVIDED WHERE A PREMIUM IS SHOWN FOR THE COVERAGE. FOR UNINSURED MOTORIST, UNDERINSURED MOTORISTS AND UNINSURED MOTORIST PROPERTY DAMAGE, THE LIABILITY LIMIT SHOWN ON THE DECLARATIONS FOR ANY ONE VEHICLE FOR THAT COVERAGE, IS THE MOST WE WILL PAY FOR DAMAGES RESULTING FROM ANY ONE ACCIDENT REGARDLESS OF THE NUMBER OF VEHICLES OR PREMIUMS SHOWN IN THE DECLARATIONS.

| VEH | YR | MAKE | MODEL | IDENTIFICATION | TYPE | SYM | ST | TERR | USE | COST NEW | CLASS | ALARM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 09 | TOYOT | PRIUS B | ▆▆▆▆ | PP | 14/14 | IL | 42 | B | | 887820 | 20% |
| 3 | 09 | BMW | 328I | ▆▆▆▆ | PP | 22/22 | IL | 42 | P | | 825420 | 20% |
| 6 | 08 | TOYOT | CAMRY H | ▆▆▆▆ | PP | 16/16 | IL | 42 | B | | 887820 | 20% |

¶ 12    After the lists of cars and drivers, the next four pages of the declarations specify the coverage details and insurance premium for each vehicle. Although most of the cars are Toyota

Camry and Toyota Pruis, the coverage and premium vary with each car, as illustrated by the two following policy excerpts. The policy indicates that Vehicle 23—which is the 2012 Camry that Bartlett was driving—had UIM bodily injury coverage in the maximum amount of $50,000 per person and $100,000 per accident:

| VEH NO. | COVERAGE DESCRIPTION | LIABILITY LIMIT (S) | DEDUCTIBLE | | PREMIUM |
|---|---|---|---|---|---|
| 2 - Preferred Auto | | | | | |
| | Bodily Injury | $50,000/$100,000 | | | $215.00 |
| | Property Damage | $50,000 | | | $160.00 |
| | Medical Payments | $1,000 | | | $33.00 |
| | Uninsured Motorist - BI | $50,000/$100,000 | | | $75.00 |
| | Underinsured Motorist - BI | $50,000/$100,000 | | | INCL |
| | Uninsured Motorist - PD | $15,000 | | | $32.00 |
| | UMPD Deductible | $250 | | | |
| | Other than Collision | | | | |
| | Collision | | | | |
| | | | | Total for Unit 2 | $515.00 |
| 3 - Special Auto | | | | | |
| | Bodily Injury | $50,000/$100,000 | | | $173.00 |
| | Property Damage | $50,000 | | | $129.00 |
| | Medical Payments | $1,000 | | | $28.00 |
| | Uninsured Motorist - BI | $50,000/$100,000 | | | $72.00 |
| | Underinsured Motorist - BI | $50,000/$100,000 | | | INCL |
| | Uninsured Motorist - PD | N/A | | | Rejected |
| | Other than Collision | | $500 | | $150.00 |
| | Collision | | $500 | | $643.00 |
| | | | | Total for Unit 3 | $1,195.00 |
| 6 - Preferred Auto | | | | | |
| | Bodily Injury | $50,000/$100,000 | | | $191.00 |
| | Property Damage | $50,000 | | | $138.00 |
| | Medical Payments | $1,000 | | | $29.00 |
| | Uninsured Motorist - BI | $50,000/$100,000 | | | $68.00 |
| | Underinsured Motorist - BI | $50,000/$100,000 | | | INCL |
| | Uninsured Motorist - PD | $15,000 | | | $30.00 |
| | UMPD Deductible | $250 | | | |
| | Other than Collision | | | | |
| | Collision | | | | |
| | | | | Total for Unit 6 | $456.00 |
| 23 - Special Auto | | | | | |
| | Bodily Injury | $50,000/$100,000 | | | $73.00 |
| | Property Damage | $50,000 | | | $54.00 |
| | Medical Payments | $1,000 | | | $11.00 |
| | Uninsured Motorist - BI | $50,000/$100,000 | | | $19.00 |
| | Underinsured Motorist - BI | $50,000/$100,000 | | | INCL |
| | Uninsured Motorist - PD | $15,000 | | | $7.00 |
| | UMPD Deductible | $250 | | | |
| | Other than Collision | | | | |
| | Collision | | | | |
| | | | | Total for Unit 23 | $164.00 |

¶ 13    An endorsement attached to the policy, entitled "SPLIT UNDERINSURED MOTORISTS LIMITS," contains what Stonegate characterizes as the contract's second liability limitation or antistacking clause. We will be referring to this as either the limit of liability clause or the endorsement's antistacking clause. We have italicized language that Stonegate considers

1-24-2355

significant:

"**LIMIT OF LIABILITY**

The limit of liability shown in the Schedule or in the Declarations *for each person* for [UIM] Coverage is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of 'bodily injury' sustained by any one person in any one accident. Subject to this limit for each person, the limit of liability shown in the Schedule or in the Declarations *for each accident*. [*sic*]

For [UIM] Coverage is our maximum limit of liability for all damages for 'bodily injury' resulting from any one accident.

This is the most we will pay regardless of the number of

1. 'insured, [*sic*]'

2. claims made;

3. vehicles or premiums shown in the Declarations; or

4. vehicles involved in the accident." (Emphasis added.)

¶ 14    In context, this language was presented as follows:

**SPLIT UNDERINSURED MOTORISTS LIMITS**   SG16
(Ed. 10-98)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SCHEDULE***

Underinsured Motorists Coverage

$_____each person

$_____each person

The first paragraph of the Limit of Liability provision in the Underinsured Motorists Coverage Endorsement is replaced by the following:

**LIMIT OF LIABILITY**

The limit of liability shown in the Schedule or in the Declarations for each person for Underinsured Motorists Coverage is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of "bodily injury" sustained by any one person in any one accident. Subject to this limit for each person, the limit of

- 8 -

liability shown in the Schedule or in the Declarations for each accident.

For Underinsured Motorists Coverage is our maximum limit of liability for all damages for "bodily injury" resulting from any one accident.

This is the most we will pay regardless of the number of
1. "insured,"
2. claims made;
3. vehicles or premiums shown in the Declarations; or
4. vehicles involved in the accident.

*Entries may be left blank if shown elsewhere in this policy for this coverage.

¶ 15     On appeal, Bartlett contends that the policy has multiple deficiencies that work together in his favor as an insured. He contends the policy lacks what he calls "specific" antistacking language because it does not expressly state there will be "no combining," "no aggregation," or "no stacking" with regard to any of the coverage, coverage limits or liability limits. He also contends that the *Hess*, *Bruder*, *Cherry*, *Johnson* and *Pekin* decisions indicate that when the declarations list the limits of UIM liability separately for each covered vehicle, "[t]his creates an ambiguity in the Declarations." See *Hess v. Estate of Klamm*, 2020 IL 124649; *Bruder*, 156 Ill. 2d 179; *Cherry v. Elephant Insurance Co.*, 2018 IL 170072; *Johnson v. Davis*, 377 Ill. App. 3d 602 (2007); *Pekin Insurance Co. v. Estate of Goben*, 303 Ill. App. 3d 639 (1999). He contends that a reasonable person would resolve this ambiguity either by adding up the 17 "each person" figures, for a total of $850,000 in UIM bodily injury coverage; the 17 "each accident" figures, for a total of $1.7 million; or both sets of figures, for a total of $2.55 million. Bartlett also contends that it is "confusing" to read the declarations together with the "SPLIT UNDERINSURED MOTORISTS LIMITS" endorsement because the information conveyed is "inconsistent," and "contradictory." The endorsement directs the reader to the "limit of liability shown in the Schedule [in this endorsement] or in the Declarations for each person for [UIM] Coverage." However, the "Schedule" contains *two* blank lines that are followed by the phrase "each person," which Bartlett

contends is an indication that one should consult the declarations and add up their 17 "each person" figures or perhaps add up and then *double* those numbers. Another purported deficiency is that the endorsement uses the phrase "each person" which Barlett contends definitively cancels out the declarations' antistacking clause. Also, the endorsement's limit of liability or antistacking clause is "very similar" to the language found to be ambiguous and ineffective in *Johnson*, 377 Ill. App. 3d at 605-06, and *Yates v. Farmers Automobile Insurance Ass'n*, 311 Ill. App. 3d 797, 797-800 (2000). Furthermore, the endorsement's antistacking clause uses the phrase "each person" but the declarations' antistacking clause uses the phrase "one vehicle," which Bartlett contends are "completely different terms" that "cannot be reasonably construed together." He concludes that all of these drafting problems indicate that the policy must be construed in his favor and that we should vacate the erroneous summary judgment order and declare that Stonegate owes him up to $850,000, $1.7 million, or $2.55 million in coverage.

¶ 16     We are not persuaded by any of these contentions. His opening argument is unpersuasive because he cites no authority that distinguishes between "specific" and "general" antistacking clauses or which indicates that "no stacking," "no combining," or "no aggregating" are magic words that a policy drafter must choose from in order to effectively preclude stacking. He also provides no rationale for us to be the first court to impose these requirements on an insurer. His presentation violates Supreme Court Rule 341(h)(7), which is the briefing rule that obligates an appellant to set out his or her legal reasoning and cite relevant authority. 134 Ill.2d R. 341(h)(7) (eff. Oct. 1, 2020). We find that Bartlett's inadequate presentation results in forfeiture of this contention. *Country Mutual Insurance Co. v. Birner*, 293 Ill. App. 3d 452, 458 (1997) (citing the rule now known as 341(h)(7)).

¶ 17    Furthermore, all of his remaining arguments either misstate the law or isolate bits and pieces of the insurance contract and contort the policy's overall meaning in violation of the bedrock principle that a policy is to be read as a whole to determine whether there is an ambiguity. See *U. S. Fire*, 88 Ill. 2d at 5. When interpreting an insurance contract, a court should neither "search for or invent ambiguities where none exists" nor "distort the [plain and ordinary] meaning of words so as to reach a desired result." *International Surplus Lines Insurance Co. v. Pioneer Life Insurance Co. of Illinois*, 209 Ill. App. 3d 144, 148 (1990). Bartlett's perspective on the policy is not a reasonable one. "Whether an ambiguity exists turns on whether the policy language is subject to more than one *reasonable* interpretation. Although 'creative possibilities' may be suggested only reasonable interpretations will be considered." (Emphasis added.) *Hobbs*, 214 Ill. 2d at 17. When we read the Stonegate policy from a reasonable perspective and as a whole, we find that it contains conspicuous, unambiguous prohibitions on stacking the UIM bodily injury limits that are applicable to a vehicle involved in a collision.

¶ 18    Bartlett's main theory is that listing the UIM bodily injury limits for each covered vehicle in the declarations section created ambiguity. He is attempting to transform *dicta* from *Bruder*, 156 Ill. 2d 179, into a bright line rule that if the declarations contain a list of the liability limits for multiple cars, then the policy is ambiguous and amenable to stacking. In *Bruder*, the Supreme Court rejected the argument that an ambiguity was created by the column layout of the declarations that it was considering. *Id.* at 193-94. It held that the declarations were subject to only one reasonable interpretation and that the interpretation was consistent with the policy's antistacking language. *Id*. at 194. However, in what became known as the "*Bruder dicta*," the court went on to hypothesize that "it would not be difficult to find an ambiguity" if an insurance policy covering

- 11 -

multiple vehicles listed the liability limits separately for each covered vehicle. *Id*. at 192. See *Allen v. Transamerica Insurance Co.*, 128 F.3d 462, 467 (7th Cir. 1997) ("The *Bruder dicta* predicts that the Illinois Supreme Court would find the anti-stacking clause ambiguous when viewed in conjunction with the columnar arrangement of the declarations page, and would therefore rule in favor of coverage."). The court said that if that format were employed, then "[i]t would be more reasonable to assume that the parties intended that, in return for the two premiums, two $100,000 coverage amounts were afforded." *Bruder*, 156 Ill. 2d at 192.

¶ 19     The Supreme Court repeated this analytical approach in *Hobbs*, but clarified that its discussion of *Bruder* "should not be construed as establishing a *per se* rule that an insurance policy will be deemed ambiguous as to the limits of liability anytime the limits are noted more than once on the declarations." *Hobbs*, 214 Ill. 2d at 26 n.1. "Variances in policy language and, in particular, antistacking clauses, frequently require case-by-case review." *Id*. Furthermore, the "declarations page of an insurance policy is but one piece of the insuring agreement" and must be construed with the other provisions in the policy. *Hobbs*, 214 Ill. 2d at 23. "Although it contains important information specific to the policyholder, the declarations page cannot address every conceivable coverage issue. Thus, *some uncertainty* could arise if the declarations page is read in isolation from the rest of the agreement." (Emphasis added.) *Id*. " 'Any provision of a lengthy document is bound to be ambiguous in the sense that it creates questions that can be answered only with reference to other portions of the document. That is why all provisions of an insurance policy must be construed together.' " *Id*. (quoting *In re Estate of Striplin,* 347 Ill. App. 3d 700, 706 (2004)). See also *Kuhn*, 2024 IL 129895, ¶ 31 (condemning the insured's argument that "regardless of the specific antistacking language used in an insurance policy, the declarations page alone will render the

policy ambiguous if the limits of liability are listed in conjunction with each insured vehicle").

¶ 20     The Supreme Court restated these principles in *Hess*, 2020 IL 124649, ¶ 24, where the insurer had listed the limits of liability for bodily injury coverage twice—once on each of the first two pages of the declarations. Although the liability limits were repeated, the court did not find that the repetition created an ambiguity regarding stacking. *Id.* The court again cautioned against addressing provisions in isolation and giving undue significance when declarations list the premiums for covered vehicles separately. *Id.* ¶¶ 20-22. The court reasoned that the liability limits had been restated on the second page of the *Hess* declarations because "the information for all four vehicles could not fit on one physical page" and there "simply was not enough space on the first page for an additional column listing the coverages and premiums for Auto 4." *Id.* ¶ 25.

¶ 21     Thus, Bartlett misconstrues the precedent he cites in support of his contention that the format of the Stonegate declarations should be construed in his favor. According to *Bruder*, *Hobbs*, and *Hess*, the fact that the declarations list the coverage details for each of Gonzo's 17 vehicles is not a decisive fact in Bartlett's favor—it is only one fact to be considered in the context of the overall insurance policy. He contends that *Cherry*, 2018 IL App (5th) 170072, and *Johnson*, 377 Ill. App. 3d 602, are particularly helpful to his appeal, but both cases are readily distinguishable. In both instances, the court found a conflict between language on the declarations page and antistacking language in the body of the policy, resulting in an ambiguity that paved the way for stacking. *Id.* As explained more fully below, there is no such conflict between the Stonegate declarations and endorsement's limit of liability language. Furthermore, unlike the *Cherry* and *Johnson* policies, the Stonegate policy contains not only the limit of liability clause in the endorsement, but also the antistacking clause in the declarations, which Bartlett does his best to

ignore. Any purported ambiguity arising from the multiple listing of the UIM bodily injury limits in the declarations is cured completely by this antistacking clause, without the reader even so much as having to leave the declarations. Then the limit of liability clause in the endorsement confirms rather than conflicts with the declarations' limiting language.

¶ 22    Proceeding to the endorsement, Bartlett contends that portions of it are confusing and inconsistent, and, thus susceptible to multiple reasonable interpretations. However, his purported struggle to understand the endorsement is attributable to his strained and unnatural reading of its provisions and his failure to address the provisions together and in context. When the endorsement is read properly, its intended meaning is readily apparent. The endorsement regarding UIM coverage begins with the "SCHEDULE*" whose lines were left blank and then there is the "LIMIT OF LIABILITY" clause that tells the reader that he or she must consult either the schedule or the declarations to find the "maximum limit of liability" for all damages caused by " 'bodily injury' " for any one "person" involved in an accident. Although Bartlett contends that he is thoroughly confused by this instruction, he is ignoring the conspicuous asterisk next to the word "SCHEDULE." The asterisk directs him to the explanation at the bottom of the endorsement that states: "*Entries may be left blank *if shown elsewhere in this policy* for this coverage." Since the lines in the schedule where the per-person limit would be listed were left blank, the only reasonable interpretation is that the endorsement instructs the reader to disregard the schedule and refer "elsewhere in this policy," back to the declarations, to determine the per-person limit, which is $50,000. The schedule's two blank lines, which are followed by the phrase "each person," are not an operative part of Bartlett's insurance contract. Bartlett was mistaken when he contended that the schedule renders the policy ambiguous as to the UIM bodily injury coverage.

¶ 23    Bartlett also isolates and misconstrues some of the language in the middle of the endorsement. The endorsement's second sentence is an incomplete sentence that provides: "Subject to this limit for each person, the limit of liability shown in the *** Declarations for each accident." The third sentence is also incomplete and states: "For [UIM coverage] is our maximum limit of liability for all damages for 'bodily injury' resulting from any one accident." When the phrases are read together, however, the thought is complete and made clear: the endorsement states that "[s]ubject to this limit for each person, the limit of liability shown in the *** Declarations for each accident" "[f]or [UIM coverage] is our maximum limit of liability for all damages for " 'bodily injury' " resulting from any one accident." Thus, the endorsement expressly refers the reader to the policy's declarations to find the "each person" and "each accident" limits of liability for UIM bodily injury coverage. The endorsements states the UIM bodily injury limits are $50,000 and $100,000, respectively. Bartlett argues that we should ignore the second sentence entirely and construe the third sentence as an instruction to add up the coverage figures associated with all 17 insured vehicles, which we find to be an unsound, unwarranted manipulation of the language in order to force an outcome in his favor. He cites no authority that endorses discarding the second sentence. Doing that would actually be contrary to the rule that courts give effect to each provision where possible. *Acuity*, 2023 IL 129087, ¶ 31. Furthermore, even if we struck the second sentence, it is impossible to construe the third sentence as an instruction to tally 17 unrelated numbers and doing that would be contrary to the rule that courts do not read the words and phrases of an insurance contract in isolation (see *Acuity*, 2023 IL 129087, ¶ 31; *U.S. Fire*, 88 Ill. 2d at 5) and the additional rule that courts do not employ "creative," unreasonable interpretations of policy language. See *Bruder*, 156 Ill. 2d at 193. When the UIM coverage endorsement, including its

"LIMIT OF LIABILITY" provision, is read as a whole and in context, it unambiguously precludes stacking of the UIM bodily injury limits.

¶ 24    Taking the analysis a step further, the declaration and endorsement together clearly prohibit stacking and are not in conflict as Bartlett argues. In *Bruder*, the Supreme Court created a framework to resolve purported conflicts between an insurance policy's declarations page and its antistacking language. *Bruder*, 156 Ill. 2d 179; *Hobbs*, 214 Ill. 2d at 26 n.1. That framework requires an evaluation of each policy on a case-by-case basis to determine if the declarations and antistacking language create an ambiguity. *Id.*; *Hess,* 2020 IL 124649; *Kuhn*, 2024 IL 129895; *Kovach v. Nationwide General Insurance Co.,* 475 F. Supp. 3d 890 (C.D. Ill. 2020) (applying Illinois law). What courts tend to find critical about multiple vehicle listings is not the number of times the vehicles are listed in the declarations, but rather, the manner in which each vehicle is listed and the purpose of the list. Illustrative of this approach is *Kovach,* 475 F. Supp. 3d 890, in which the district court was asked to evaluate a policy containing an identical limited liability clause to that of *Hess* and which listed multiple limits of liability on the declarations page. *Id.* at 896-97. The court followed the Supreme Court's guidance and attempted to discern whether the insurer had good reason for listing the liability limits multiple times in the declarations. *Kovach*, 475 F. Supp. 3d at 896-97. The insurer argued that it was reasonable to list the coverages and liability limits for each vehicle because the coverages varied, *i.e.*, the "2001 Corolla has no protection for the auto itself, while the other [three] vehicles do." *Id.* at 897. The court agreed and found it "reasonable for a company to desire to lay out in detail what exactly is happening with each vehicle when coverages vary." *Id.* "[T]he clear incentive to specify detailed coverage per vehicle in conjunction with a Limit of Liability clause that specifically limits maximum payments

for each person for bodily injury liability overwhelms the suggestion that listing liability limits multiple times could *** bring about ambiguity." *Id*. at 898. The court held that the insurance policy, read as a whole, was not ambiguous. *Id*.

¶ 25    In *Kuhn*, 2024 IL 129895, the Supreme Court applied the reasoning of *Hess,* which held that it was not only reasonable but necessary for the insurer to list the policy's liability limits multiple times on the declarations since the policy covered seven different vehicles, and the policy unambiguously precluded the stacking of liability limits. *Id.* ¶¶ 31, 38, 67 ("[An antistacking clause's] function is to say that *even if* some other clause suggests the possibility of stacking, that is not what the policy means. It is a disambiguator. To see ambiguity in the policy is to learn why the antistacking clause was included.") (Emphasis in original.) In addition to relying on *Hess*, the Supreme Court referenced its analysis in *Hobbs*, which cautioned against reading an insurance policy's declarations in isolation when determining whether the policy permits stacking. *Id.* ¶ 41 (citing *Hobbs*, 214 Ill. 2d at 23) (uncertainty can arise if a declarations page is read in isolation, so a court must examine the complete document when interpreting an insurance policy).

¶ 26    The Stonegate policy clearly and expressly prohibits stacking UIM bodily injury limits. The antistacking clause in the declarations is conspicuously placed, is printed in all capital letters and bold font, and plainly states that the UIM bodily injury limit for a single vehicle "IS THE MOST WE WILL PAY FOR DAMAGES RESULTING FROM ANY ONE ACCIDENT, REGARDLESS OF THE NUMBER OF VEHICLES OR PREMIUMS SHOWN IN THE DECLARATIONS." It strains credulity when Bartlett argues that the antistacking language could be more clear. *See Hobbs*, 214 Ill. 2d at 25 (the listing of a limit of liability for each vehicle could lead to an ambiguity "[i]n the absence of other qualifying language in the antistacking clause").

Moreover, the endorsement's "LIMITS OF LIABILITY" provision leaves no doubt that the stacking of UIM bodily injury limits is not possible. The endorsement informs the reader that (1) the "maximum limit of liability for all damages" that Stonegate could have to pay Bartlett for UIM bodily injury coverage is "the limit of liability shown in the *** Declarations for each person for [this] Coverage," *i.e.,* $50,000, and (2) that this limitation applies to all damages arising out of " 'bodily injury' " sustained by Bartlett in one accident, "regardless of the number of *** vehicles or premiums shown in the Declarations." The only reasonable interpretation of the policy is that stacking the UIM bodily injury limits is not allowed. *See Hobbs,* 214 Ill. 2d at 21 ("The declarations page here, like the declarations page in *Bruder*, lists the premiums for the two vehicles separately, but, importantly, lists the relevant limit of liability only once. In addition, the Hartford policy, like the policy in *Bruder,* indicates that the antistacking provision applies regardless of the number of covered vehicles. *** [W]e agree with Hartford that, pursuant to our holding in *Bruder,* [UIM] coverage under Hobbs' policy cannot be stacked.").

¶ 27    Furthermore, as in *Kovach, Hess,* and *Kuhn,* the Stonegate declarations reflect that the coverages and policy limits for each individually listed vehicle vary. *Kovach*, 475 F.Supp.3d 890; *Hess*, 2020 IL 124649; *Kuhn*, 2024 IL 129895. In particular, the coverage afforded Vehicles 3 and 8 was different, as those cars were subject to a $500 deductible for "Other than Collision" and/or "Collision" and otherwise were not subject to UIM property damage coverage. Stonegate, thus, has a reasonable explanation for listing the coverages and UIM bodily injury limits for each vehicle because the premiums for each vehicle differed. Also, because Gonzo's was changing its insured vehicles often (Stonegate contends there were more than 50 changes during the policy year), it was necessary to list the vehicles separately. *See also Kovach,* 475 F. Supp. 3d at 898 ("In this case,

the clear incentive to specify detailed coverage per vehicle in conjunction with a Limit of Liability clause that specifically limits maximum payments for each person for bodily injury liability overwhelms the suggestion that listing liability limits multiple times could, in some circumstances, bring about ambiguity."). Listing each car's coverage and associated premium made the policy more precise and unambiguous.

¶ 28    Bartlett's contention that the policy permits stacking of the "per-person" and "per-accident" limits 17 times, despite the above language, would lead to an absurd result. *See Springfield Fire & Casualty Co. v. Garner*, 255 Ill. App. 3d 685, 695 (1993) (observing that an insurance policy should not be construed in a way that would lead to an absurd conclusion). Instead, the only reasonable conclusion from reading the endorsement and the declarations together is that the policy unambiguously precludes stacking, as they together make clear that $50,000 is the maximum per person liability limit, regardless of the number of vehicles or premiums shown in the declarations.

¶ 29    Bartlett's discussion of the Fifth District's opinions in *Yates*, *Johnson*, *Cherry* and *Pekin* is unavailing, in part because the Fifth District did not follow the Supreme Court's lead and address *why* the policies listed the UIM limits separately for each covered vehicle. *Yates*, 311 Ill. App. 3d 797; *Johnson*, 377 Ill. App. 3d 602; *Cherry*, 2018 IL App (5th) 170072; *Pekin*, 303 Ill. App. 3d 639. Also, those policies did not include the *additional* antistacking language that was printed on every page of the Stonegate declarations. The policies in the Fifth District decisions did not contain any such language. Stonegate's two antistacking provisions were a belt and suspenders approach which resolved any purported ambiguity when the declarations listed separate UIM bodily injury limits for each of Gonzo's many vehicles. Furthermore, the court found that the weaker

antistacking language in *Johnson*'s "general provisions" section, "[did] not even come into play," because the UIM endorsement directed the reader to the declarations for the liability limit, not the policy's general provisions. *Johnson*, 377 Ill. App. 3d at 610. The policy at issue in *Cherry* was found ambiguous on stacking for an additional reason. That policy's limit of liability clause stated there would be no stacking or combining of "coverages" ("*e.g.*, an insured may not combine his 'property damage liability' with his 'other than collision' liability") but was silent on whether the stacking or combining the "limits of liability" was also prohibited. *Cherry*, 2018 IL App (5th) 170072, ¶ 9. The court held that the terms "coverage" and "limit of liability" of a particular coverage are not synonymous terms. *Id.* ¶ 22. Thus, the court found that the policy before it was "plainly susceptible to more than one reasonable interpretation—the insured may be prohibited from combining his different coverages, or he may be prohibited from aggregating the limits of his coverages." *Id*. In contrast, the antistacking terms in the Stonegate policy lead to only one reasonable interpretation—stacking of UIM bodily injury limits is prohibited. And *Pekin* is wholly inapposite, given that its UIM endorsement lacked a liability limit and sent the reader to the declarations for this information, where the "500/500" UIM limits were listed separately for each of the two covered vehicles. *Pekin*, 303 Ill. App. 3d at 647-68. The *Pekin* policy reasonably could have been read as $500,000 in coverage or $1 million in total coverage ($500,000 for each of the covered vehicles). *Id.* at 648. Thus, the *Pekin* policy was just what the *Bruder* court had envisioned when it stated, "There would be little to suggest in such a listing that *** coverage was to be limited to that provided for only one of the two [vehicles]. It would be more reasonable to assume that the parties intended that, in return for the two premiums, two *** coverage amounts were afforded." *Bruder*, 156 Ill. 2d at 192. The *Pekin* and Stonegate policies are polar opposites.

¶ 30    For these reasons, we reject Bartlett's appeal and affirm the summary judgment ruling in favor of Stonegate.

¶ 31    Affirmed.